David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD LLP
110 Laurel Street
San Diego, California 92101
Tel:  (619) 238-1811; Fax: (619) 544-9232

Thomas A. Zimmerman, Jr. (*pro hac vice pending*)
*tom@attorneyzim.com*
Matthew C. De Re (*pro hac vice pending*)
*matt@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
Tel:  (312) 440-0020; Fax: (312) 440-4180

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Amy Joseph**, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>**Bumble Bee Foods, LLC, TriUnion Seafoods, LLC, Starkist Company,** and **King Oscar, Inc.**<br><br>Defendants. | CASE NO.  **'15CV2017 BTM NLS**<br><br>**Class Action Complaint for Damages and Declaratory and Injunctive Relief for Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1-3.** |

# CLASS ACTION COMPLAINT

Plaintiff Amy Joseph (hereafter "Plaintiff") brings this action individually, and on behalf of all others similarly situated, by and through counsel, and complains against Defendants Bumble Bee Foods LLC, Tri-Union Seafoods LLC, StarKist Company, and King Oscar, Inc. (collectively, "Defendants"), as follows:

## INTRODUCTION

1. Plaintiff brings this class action to redress Defendants' deceptive and unlawful business acts and practices in connection with the alleged conspiracy to fix, maintain, and/or stabilize the price of packaged seafood products ("PSPs") from at least January 2000 to the present. As alleged herein, Defendants' unlawful actions violate Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3 ("Sherman Act").

2. Defendants are the three largest producers of PSPs sold in the United States. As used herein, the term PSPs refers to PSPs (predominantly tuna) sold in cans, pouches, and/or ready-to-eat serving packages.

3. In recent months, it has been disclosed that the Defendants had received grand jury subpoenas from the Antitrust Division of the Department of Justice ("DOJ"). Subsequent news reports indicate that there is an investigation of the industry by the DOJ.

4. As a result of Defendants' unlawful conduct, competition has been restrained and consumers, including Plaintiff and members of the putative Class, have been forced to pay unreasonably high prices for PSPs and have suffered harm.

5. The allegations in this Complaint are based on the personal knowledge of Plaintiff as to herself, and on information and belief as to all other matters through investigation of Plaintiff's undersigned counsel.

## JURISDICTION

1

6. Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

7. This court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law, and under 28 U.S.C. § 1337 for federal antitrust claims in particular.

8. Under 15 U.S.C. § 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d), this District has venue over the action, as Defendants resided, transacted business, were found, and/or had agents in this District, and this District was the site of a substantial portion of the affected interstate trade and commerce discussed herein during the Class period.

## Parties

9. Plaintiff is a resident and citizen of Illinois. Plaintiff purchased PSPs from all of the Defendants and has suffered as a result of the violations alleged herein.

10. Defendant Bumble Bee Foods LLC ("Bumble Bee") is a Delaware limited liability company, with its principal place of business at 280 10th Avenue, San Diego, California 92101.

11. Defendant Tri-Union Seafoods LLC is a California limited liability company, with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union Seafoods LLC markets its products using the brand name Chicken of the Sea. Unless otherwise indicated, Tri-Union Seafoods LLC will be referred to herein as "Chicken of the Sea."

12. Defendant StarKist Company ("StarKist") is a Delaware corporation, with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212.

13. Defendant King Oscar, Inc. ("King Oscar") is a Delaware corporation, with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108.

14. Chicken of the Sea and King Oscar are wholly-owned subsidiaries of Thai Union Frozen Products Public Company, Ltd. ("Thai Union"), a publicly held company headquartered in Thailand.

15. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

16. Defendants' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in this District, as intended by Defendants.

17. Defendants distributed and sold PSPs in an uninterrupted and continuous flow of interstate commerce among the United States. Defendants' anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTS

18. Defendants sell PSPs to individuals, retail stores, and mass merchandisers, among others. The market for PSPs generated over $2 billion in revenue in 2014. A large portion of that revenue comes from the sale of canned tuna.

19. Defendants are the three largest manufacturers of PSPs in the United States. The industry is highly concentrated and industry consolidation has resulted in a monopolistic structure, with the three Defendants controlling approximately 75% of the market. The remaining share is split among smaller companies and brands.

3

20. In December 2014, Thai Union proposed to acquire its competitor Bumble Bee. The proposed merger would have unreasonably consolidated the market, with the combined company owning nearly half the market. In July 2015, Thai Union suspended the planned acquisition due to the antitrust investigation by the DOJ into the industry and the Defendants. That merger is presently on hold as a result.

21. Economic factors played a role in the conspiracy perpetrated by Defendants. Consumption of PSPs has steadily declined in the United States since 2000. However, retail prices for PSPs continued to rise despite the decrease in consumer demand and decrease in Defendants' raw materials costs. Indeed, there has been an over 100% increase in retail prices for PSPs since 2007.  These economic factors are further evidence that Defendants unreasonably charged consumers high prices for the PSPs they sold.

22. Recently, growth for PSPs has diminished due in part to health and sustainability concerns, as well as a general shift by the public away from packaged seafood. In order to combat diminished profits, the Defendants conspired to illegally raise and maintain the prices of PSPs.

23. Defendants had multiple opportunities to collude in regards to price fixing in the industry. The industry's trade group, the Tuna Council, represents all of the Defendants' interests. On information and belief, over the past decade Defendants regularly attended conferences and trade shows, where they discussed pricing of PSPs and other elements of the conspiracy. Additionally, from 2011 to 2012 Defendants had a joint advertising campaign intended to increase the consumption of tuna and Defendants' sales of PSPs. Defendants also collaborated on the International Seafood Sustainability Foundation. Defendants have agreements to pack each other's products in their respective facilities. For example, Bumble Bee packs products for Chicken of the Sea, and vice versa.

24. On information and belief, despite the failure of the joint advertising campaign in 2012 to raise consumption and sales, Defendants jointly implemented a price increase that year anyway.

25. On information and belief, beginning in at least 2007 and continuing to the present, Defendants colluded in anticompetitive communications with each other, including telephone calls and in-person meetings. During these communications, Defendants shared sensitive business information and entered into agreements to fix, maintain, and raise the prices of PSPs. Defendants, including senior executives, regularly met to discuss pricing and agreed to coordinate the timing of price increases.

26. On information and belief, senior executives of Defendants met at least twice a year and discussed pricing and shared sensitive customer information, and on one such occasion, StarKist informed Bumble Bee that StarKist and Tri-Union were in agreement to raise prices for PSPs.

27. On information and belief, Defendants agreed to exchange, and did exchange, information during their conversations and meetings regarding enforcement of adherence to their agreements, and they agreed to restrict capacity and allocate customers.

28. In its annual reports, Thai Union discussed the industry landscape and pricing strategy. In its 2013 annual report, Thai Union stated that its tuna business showed strong growth the previous year due to price adjustments and more rational market competition. Thai Union also stated that its future profits would depend upon reasonable competition in the United States tuna market without unnecessary pricing. The next year, in its 2014 annual report, Thai Union remarked that it had, in fact, achieved its prior stated goal of rational market competition. Thai Union stated that this increased profitability was due specifically to reduced price competition and lower raw material costs, despite limited sales growth.

29. There are substantial barriers for potential competitors to enter the industry and challenge Defendants' market share, including high costs, access to raw materials, manufacturing experience and capabilities, and access to distributors. As a result, Defendants could raise prices without fear of being challenged by newcomers into the industry.

30. There are no economically reasonable substitutes for PSPs. Alternative seafood, such as fresh seafood, does not have commensurate shelf life and requires preparation by the customer before it can be consumed.

31. On information and belief, purchasers regularly source their PSPs from one of the Defendants. As a result, Defendants dominate the market in the United States. Defendants possessed significant market power to raise prices.

32. Defendants unlawfully and fraudulently concealed their conduct from discovery by Plaintiff.

33. Plaintiff did not discover, and could not have discovered through reasonable due diligence, the existence of the conspiracy and Defendants' involvement in the conspiracy until the DOJ's investigation became public on July 23, 2015.

34. Upon information and belief, StarKist applied for admittance into the DOJ's corporate leniency program to report Defendants' price-fixing and anticompetitive conduct in the United States.

35. Upon information and belief, StarKist was accepted into the DOJ's corporate leniency program.

36. Due to the active concealment of the conspiracy until July 23, 2015, Plaintiff was unaware of Defendants' unlawful conduct, and did not know that she was paying artificially high prices for PSPs.

37. The unlawful conduct of Defendants, including actions in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner to avoid detection.

38.     Defendants agreed among themselves not to publicly discuss, or otherwise reveal, the nature and substance of their acts and communications in furtherance of the conspiracy. Defendants met and communicated secretly in order to avoid detection.

39.     Plaintiff, through the use of reasonable diligence, could not have discovered the conspiracy at an earlier date because of the fraudulent practices and techniques used by Defendants to avoid detection of, and fraudulently conceal, the contract, combination, or conspiracy. The conspiracy was fraudulently concealed by various means, including, but not limited to, secret meetings between Defendants, deceptive information to consumers, and communications between Defendants in the form of in-person meetings and telephone calls in order to avoid the production of written records.

40.     Because the conspiracy was concealed by Defendants until July 23, 2015, Plaintiff had no knowledge of the conspiracy or any information that would have led a reasonable individual to investigate whether a conspiracy existed. None of the information available to Plaintiff prior to July 23, 2015, even if investigated with reasonable diligence, would have led to the discovery of the conspiracy prior to July 23, 2015.

41.     As a result of Defendants' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims of anticompetitive conduct alleged herein.

## Class Allegations

42.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of herself and a putative Class of all others similarly situated, defined as follows:

> All persons and entities who purchased PSPs in the United States from any Defendant or any predecessor, subsidiary, or affiliate thereof, at any time between July 23, 2011 and the present.

7

Excluded from the Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

43. **Numerosity**: The exact number of Class members is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. Due to the size of the industry and the amount of yearly sales of PSPs in the United States, the Class likely consists of thousands of individuals that are geographically dispersed throughout the country.

44. **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiff and members of the putative Class, and those questions predominate over any questions that may affect individual putative Class members. Common questions include, but are not limited to, the following:

    A. Whether Defendants engaged in a conspiracy with each other to fix, raise, or maintain the prices of PSPs;

    B. Whether the purpose or effect of the acts and omissions alleged herein was to restrain trade, or to affect or control the prices of PSPs;

    C. The existence and duration of the agreements between Defendants alleged herein to fix, raise, or maintain the prices of PSPs;

    D. Whether Defendants violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

    E. Whether Defendants' agents, officers, employees, or representatives participated in activities or correspondence in furtherance of the unlawful conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives

were acting within the scope of their authority and in furtherance of Defendants' business interests;

F. Whether, and to what extent, Plaintiff and members of the Class were damaged as a result of Defendants' conduct alleged herein; and

G. Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

45. **Typicality**: Plaintiff's claims are typical of the claims of the Class members. All are based on the same legal and factual issues. Plaintiff and each of the Class members purchased PSPs from the Defendants during the relevant time period. Moreover, Defendants' aforementioned misrepresentations and omissions were uniformly made to Plaintiff and all Class members.

46. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

47. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, because joinder of all parties is impracticable. Furthermore, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by individual Class members are likely to be relatively small, especially given the burden and cost of individually conducting the complex litigation necessitated by Defendants' actions. Even if Class members were able or willing to pursue such individual litigation, a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Complaint. A class action, on the other hand, provides the benefits of fewer

management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single court, and would result in reduced time, effort and expense for all parties and the Court, and ultimately, the uniformity of decisions.

48. Unless a class is certified, Defendants will retain monies received as a result of their conduct that was wrongfully taken from Plaintiff and Class members. Unless an injunction is issued, Defendants will continue to commit the violations alleged, and the members of the putative Class and the general public will continue to be misled and continue to be overcharged for PSPs.

49. By engaging in the unlawful conspiracy and conduct alleged herein, Defendants have acted and refused to act on grounds generally applicable to the proposed Class, making appropriate final injunctive relief with respect to the proposed Class as a whole.

## COUNT I

**Violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

50. Plaintiff repeats and re-alleges paragraphs 1-49 as though fully set forth herein.

51. Defendants engaged in a continuing contract, combination, and conspiracy to unlawfully raise, maintain, and stabilize the prices of PSPs in the United States in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

52. Defendants restrained trade or commerce by fixing, raising, maintaining, and stabilizing the prices of PSPs at artificially and unreasonably high levels.

53. In carrying out their contract, combination, and conspiracy, Defendants engaged in anticompetitive practices, which had the effect of artificially fixing, raising, maintaining, and stabilizing prices of PSPs.

54. As a result of Defendants' illegal combination and conspiracy as alleged herein, there were detrimental effects on consumers. The prices charged by

Plaintiff's Opposition to MSJ; Memorandum of P&A                             Case No. 14-cv-0025

Defendants, and paid by Plaintiff and Class members, were artificially and unreasonably high for PSPs. Plaintiff and the Class have been deprived of a competitive market for PSPs. Plaintiff and the Class were forced to pay more than they otherwise would have paid for PSPs if there had been competition in the marketplace. Competition in the market for PSPs has been restrained and/or eliminated. As a result of Defendants' conspiracy, consumers have suffered higher prices and reduced options.

WHEREFORE, Plaintiff prays for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B. Designating Plaintiff as representative of the Class, and her undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiff and the Class and against Defendants;

D. Enjoining and restraining the maintenance or continuation of Defendants' illegal conduct alleged herein and ordering disgorgement of any of their ill-gotten gains;

E. Adjudging and decreeing that the contract, combination, and conspiracy alleged herein is an unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

F. Awarding Plaintiff and the Class treble damages;

G. Awarding Plaintiff and the Class actual and punitive damages, attorney's fees and costs, including interest thereon, as allowed or required by law; and

H. Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

Dated: September 10, 2015   CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP

By: s/ Gayle M. Blatt
     Gayle M. Blatt, Esq.

ZIMMERMAN LAW OFFICES, P.C.

By: s/Thomas A. Zimmerman, Jr. (*pro hac vice pending*)
     Thomas A. Zimmerman, Jr., Esq.

Attorneys for Plaintiff AMY JOSEPH, individually, and on behalf of all others similarly situated.